**In re BULLDOG TRUCKING, INC., a Delaware Corporation, f/d/b/a Bulldog Trucking of Georgia, Inc., Debtor, I.D. No. 58–0679633.**

**Langdon M. COOPER, Trustee for Bulldog Trucking, Inc., Plaintiff,**

**v.**

**E.I. DU PONT de NEMOURS & CO., Defendant.**

**No. C–B–90–31936.**
**Adv. No. 92–3100.**

United States District Court, W.D. North Carolina, Charlotte Division.

June 21, 1994.

---

Joseph L. Steinfeld, Jr., Sims Walker & Steinfeld, P.C., Washington, DC, for Langdon M. Cooper.

Langdon M. Cooper, Trustee, Mullen Holland & Cooper, P.A., Gastonia, NC.

Robert H. Pryor, Smith Helms Mulless & Moore, Charlotte, NC, for E.I. DuPont de Nemours & Co.

James Sullivan, Office of U.S. Atty., Charlotte, NC, for U.S.

## ORDER AND JUDGMENT

## DETERMINING THE INAPPLICABILITY OF THE NEGOTIATED RATES ACT 1993, GRANTING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF ON HIS CLAIMS, DENYING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT, MAKING RULE 54 CERTIFICATION, and STAYING ENFORCEMENT OF JUDGMENT UNDER RULE 62(h)

ROBERT D. POTTER, District Judge.

This matter, which is related to a case under Title 11, is before the Court after notice and a hearing, as that phrase is defined in the Bankruptcy Code, and upon recommendation of the bankruptcy judge under the provisions of 28 U.S.C. § 157(c)(1) for entry of final order and judgment; and after reviewing *de novo* those matters to which any party has timely and specifically objected, and after due consideration of the bankruptcy judge's proposed order and memorandum decision, which this Court adopts and confirms with approval as the basis for this Order and Judgment; it is hereby

### ORDERED AND ADJUDGED that:

1. Section 2 of the Negotiated Rates Act of 1993, signed by the President on December 3, 1993 as Pub.L. No. 103–180 (s. 412), is inapplicable to the Trustee and the bankruptcy estate of Bulldog Trucking, Inc.

2. There is no just cause for delay of the grant and entry of judgment in favor of the Trustee on his interstate freight undercharge claims. Therefore, the Trustee's Motion for Summary Judgment on his claims based on interstate movement is hereby **GRANTED** as a final judgment in favor of the Trustee against the Defendant in the amount of $1,339,853.30, which includes principal and accrued interest through June 3, 1992, with per diem interest since that date until paid in the amount of $227.22, plus court costs of $120.00. The Clerk of Court is directed to enter this judgment in favor of the Trustee.

3. The cross motion of the Defendant for summary judgment in its favor on the Trustee's claims is hereby **DENIED.**

4. Enforcement of the judgment in favor of the Trustee as described in decretal paragraph number 2 above is hereby **STAYED** at least until April 13, 1994, but in any event until the Bankruptcy Court after notice to the Defendant and a hearing determines to terminate or otherwise modify this stay.

## RECOMMENDED ORDER AND MEMORANDUM DECISION

—re: inapplicability of NRA

—re: summary judgment for Trustee

—re: Rule 54 certification

—re: stay of execution

MARVIN R. WOOTEN, Bankruptcy Judge.

This matter came on to be heard and was heard on February 1, 1994 at a consolidated hearing in this and numerous other similar pending adversary proceedings on Motion of the Plaintiff, Langdon M. Cooper, Trustee (the "Trustee") for Reconsideration of this Court's prior order denying a Rule 54 certification and immediate entry of summary judgment; and after consideration of the record and the arguments of counsel for the Interstate Commerce Commission (the "ICC"), the Trustee, numerous defendants in the other similar adversary proceedings and E.I. du Pont de Nemours & Co. (the "Defendant"); and after notice and a hearing, this Court finds and concludes as follows[1]:

*This Order and Memorandum Decision determining the inapplicability of the Negotiated Rates Act of 1993, providing for the*

---

1. Because of the importance of this matter the Court has elected to enter an Order and Memorandum Decision. Thus Findings of Fact and Conclusions of Law may overlap. To the extent any of the Court's findings of fact are conclusions of law, or to the extent that any of the Court's conclusions of law are findings of fact, this Court intends that they should be so deemed.

*grant and entry of a final summary judgment in favor of the Trustee on his claims against the Defendant, providing for certification of that judgment under Fed.R.Civ.P. 54(b), and providing for a stay of execution under Fed.R.Civ.P. 62(h)* is **HEREBY RECOMMENDED** to the United States District Court for adoption and entry herein after "notice and a hearing", for the reason that this matter has been determined by the undersigned to be a matter related to a case under Title 11, all in accordance with the provisions of 28 U.S.C. § 157(c)(1).

## I. *INTRODUCTION*

On June 24, 1992 the Trustee moved the Court for summary judgment, and shortly thereafter the Defendant filed a cross motion for summary judgment. On April 13, 1993 this Court granted but did not enter partial summary judgment against the Defendant and in favor of the Trustee. This Order and Memorandum Decision, and the separate Summary Judgment the Court will be entering, will replace and restate that portion of the prior order in which the Court granted the Trustee partial summary judgment. On April 13, 1993 this Court also modified the automatic Stay of 11 U.S.C. § 362 to permit the Defendant to present to the ICC in a reparations action any claim of rate unreasonableness it had, and stayed this adversary proceeding for twelve months for the limited purpose of allowing the Defendant to request from the ICC a determination as to whether Bulldog's applicable published tariff rates are reasonable, and if the ICC determines that those rates are not reasonable for it to determine what is the reasonable rate and then to award reparations in the amount of the difference between the sum of the tariff rates and the sum of the reasonable rates for the shipments. Defendant filed its complaint before the ICC on May 14, 1993.

On October 8, 1993 the Trustee moved this Court to make a Rule 54 certification and enter final summary judgment against the Defendant. On November 1, 1993 this Court in its discretion denied as premature the Trustee's motion for the Rule 54 certification and immediate entry of final judgment.

On January 12, 1994 the Defendant moved the Court to expand its prior modification of the stay to allow it to pursue all remedies afforded under the Negotiated Rates Act of 1993, signed by the President on December 3, 1993 as Pub.L. No. 103–180 (S. 412) (the "NRA"). On January 14, 1994 the Trustee moved this Court to reconsider its order issued from the bench on November 1, 1993 denying the Trustee's earlier motion for a Rule 54 certification and immediate entry of final judgment in favor of the Trustee.

On January 28, 1994 the United States through the Department of Justice filed a Suggestion of Interest pursuant to 28 U.S.C. § 517, together with a brief in support thereof.[2] The United States opposed the position of the Trustee.

The Trustee's motion for reconsideration, *i.e.*, in effect his renewed motion for a Rule 54 certification and entry of final judgment on his claims (the "Motion"), is made on the following grounds:

(a) Sections 2(a)–(c) and (e)–(g) of the NRA are ineffective and unenforceable against the Trustee and the bankruptcy estate of Bulldog Trucking, Inc. ("Bulldog") pursuant to Section 9 of the NRA itself and under 11 U.S.C. §§ 541(c)(1), 363(*l*) and 362(a)(3);

(b) Section 8 of the NRA is ineffective and unenforceable against the Trustee and the bankruptcy estate of Bulldog under Section 9 of the NRA and 28 U.S.C. §§ 1334 and 157; and

(c) The ICC is nevertheless issuing virtually identical orders (decisions) at this time

---

**2.** 28 U.S.C. § 517 authorizes the Attorney General of the United States to send "any officer of the Department of Justice ... to attend to the interests of the United States in a suit pending in a court of the United States...." Under this section, the United States may assert to a court its views or those of an involved agency in matters deemed of significant interest. *United States v. Allegheny–Ludlum Industries, Inc.*, 517 F.2d 826,

867 n. 55 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). The United States points out that the Trustee's challenges to the NRA are common to numerous pending adversary proceedings pending in this Court. The United States appeared and argued at the consolidated hearings before this Court on February 1, 1994 through counsel for the ICC.

to reopen the record in the reparations and other actions pending before it which were filed by the defendants in this and other similar adversary proceedings so that "the parties (can) submit evidence and argument under the section 2(e) alternative procedure." The ICC states in each order that "(t)he section 2(e) alternative procedure provides that the Commission shall determine whether any particular collection effort is or is not an unreasonable practice." The ICC further directs the parties' attention to other dispute resolution mechanisms in the NRA, including Section 8.

The Defendant and the United States oppose the Trustee's Motion and argue that: (i) the canons of statutory construction preclude this Court from holding that the NRA is inapplicable to the Trustee because such a result would be absurd since, as the Defendant and the United States contend, it was the intent of Congress in the NRA to resolve the so-called crisis created by bankruptcy trustees and debtors asserting billions of dollars of freight undercharge claims against shippers; (ii) sections 363(*l*) and 541(c) of the United States Bankruptcy Code (the "Bankruptcy Code") are not applicable to the NRA, which according to the Defendant and the United States permissibly redefined the scope of Bulldog's property rights; (iii) in any event the application of the NRA is not conditioned on a carrier's financial condition; and finally (iv) Rule 54 certification and immediate entry of final judgment against the Defendant is improper.

At the outset this Court must state for the record that if it was the intent of Congress to abolish the filed rate doctrine, it should have done so plainly and unequivocally. If it was the intent of Congress to amend Title 11 or Title 28, it should have done so plainly and unequivocally. With the NRA, Congress has accomplished neither result. For the reasons set forth in this Order and Memorandum Decision, it is the opinion of this Court that the Trustee, who had the burden of persuasion in this matter, clearly must prevail. The NRA is inapplicable to the Trustee, and the ICC's actions nevertheless to implement its provisions against the Trustee

make it abundantly clear that Rule 54 certification is now proper. Summary judgment in favor of the Trustee on his claims against the Defendant should be immediately entered.

## II. *FINDINGS OF FACT*

This adversary proceeding is typical of many similar cases appearing since the 1980 deregulation of the trucking industry that have been filed by bankruptcy trustees of motor common carriers, as well as by motor common carriers who are themselves debtors-in-possession. The usual fact pattern involves a motor carrier who negotiated with a shipper to charge that shipper less than the tariff rate the Interstate Commerce Act ("ICA"), 49 U.S.C. § 10101 *et seq.*, required the carrier to publish and file with the ICC. After the shipments were delivered, and after the shipper paid for the shipments at the "negotiated" rate, the carrier filed a bankruptcy petition.

Since the carrier charged less than the published tariff rate which the carrier's bankruptcy trustee contends was the legal rate, the trustee asserts that a claim exists in favor of the carrier's bankruptcy estate against the shipper for the difference between what the carrier's bankruptcy trustee contends is the legal filed rate and the parties' negotiated rate. When a bankruptcy petition is filed by or against the carrier, this freight undercharge claim becomes property of the carrier's bankruptcy estate under 11 U.S.C. § 541 which the Trustee may use under 11 U.S.C. § 363(*l*). The carrier's bankruptcy trustee or the carrier as a debtor-in-possession then files suit against the shipper to collect the difference, *i.e.*, to collect the freight undercharges. Whether the claim is meritorious is of course a matter for the court to determine. The case at bar is such an action.

The shippers' common defenses in these cases have been tariff applicability, contract carriage and that the attempt to collect a higher rate than that negotiated was an "unreasonable practice". Additionally the shippers have asserted the counterclaim that the applicable tariff rate was unlawful because it was unreasonably high. In *NITL—Petition to Institute Rulemaking on Negotiated Mo-*

*tor Common Carrier Rates,* 5 I.C.C. 2d 623 (1989) the ICC publicly announced that it approved of the shippers' defense that it was an unreasonable practice to collect a rate higher than the rate negotiated. In *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) (*"Maislin"*) the United States Supreme Court held the "Negotiated Rates" policy of the ICC invalid under the ICA as it rendered meaningless the mandate of 49 U.S.C. § 10761 that a carrier must charge and collect its filed rate.

In the past three years, the United States Supreme Court, various Circuit Courts of Appeals and United States District Judges Robert Potter and Graham C. Mullen in the Western District of North Carolina have all rejected various efforts by the ICC and shipper defendants to violate the automatic stay of 11 U.S.C. § 362 and to nullify the filed rate doctrine in 49 U.S.C. § 10761 of the ICA.

In the meantime, the ICC and shipper groups lobbied Congress for legislative relief. In response, Congress enacted the NRA. The provisions of the NRA purport to strip— only from non-operating freight motor carriers—80% to 100% of their freight undercharge claims against shippers, and in the case of Bulldog virtually all of its undercharge claims.

The ICC/shipper coalition failed to persuade Congress to abolish the filed rate doctrine of 49 U.S.C. § 10761. It remains. The Courts continue to have original and exclusive jurisdiction over the collection of motor carrier rates on past transportation under 49 U.S.C. § 11706(a). *See White v. United States,* 989 F.2d 643 (3rd Cir.1993); *see* also 28 U.S.C. §§ 1334 and 157. This coalition also failed to persuade Congress to amend Titles 11 or 28. Indeed, Section 9 of the NRA expressly provides that the NRA does *not* limit or affect the application of Title 11 or Title 28.

Bulldog was, at all times relevant to these proceedings, a motor common and contract carrier operating in interstate commerce pursuant to authority issued by the ICC. It provided shipping services to its customers ("shippers") primarily in the Southeast United States.

Bulldog did not survive the period of illegal rate destabilization[3] promoted by the ICC's *Negotiated Rates* policy. By petition filed on December 11, 1990 with this Court, Bulldog sought to effect a reorganization with its creditors pursuant to the provisions of Chapter 11 of the U.S. Bankruptcy Code. On February 14, 1991 Bulldog's Chapter 11 case was converted to a Chapter 7 liquidation and Plaintiff, Langdon M. Cooper was appointed Chapter 7 Trustee. This Court thereafter authorized the Trustee to employ professionals to pursue over $7 million in freight undercharge claims against shippers that received illegal discounts from Bulldog.

Bulldog no longer transports property for compensation, nor for that matter does it conduct any operations. The primary asset of Bulldog's bankruptcy estate consists of the right to assert claims to recover freight undercharges from the shippers that extracted illegal discounts from Bulldog while it became insolvent and neglected to pay its employees, numerous taxing authorities and other creditors. Bulldog owes more than 1,000 creditors in excess of $16 million in priority wage and tax claims, and other claims. The Bulldog estate has approximately $9 million of assets, of which approximately $7 million are freight undercharge claims. Without collection of these freight undercharge claims it will be impossible to pay Bulldog's creditors any material dividend.

In 1992 the ICC promulgated invalid regulations (the "MC–208 Regulations") to prevent the Trustee for Bulldog and the trustees of other non-operating carriers from collecting freight undercharges. These MC–208 Regulations applied to all "non-operating carriers," and prohibited them from pursuing or asserting certain freight undercharge claims

---

3. One of the purposes of the filed rate doctrine is rate stabilization. *Maislin,* 497 U.S. at 117, 110 S.Ct. at 2761, 111 L.Ed.2d at 108 ("The duty to file rates with the Commission, *see* 49 U.S.C. § 10762, and the obligation to charge only those rates, *see* 49 U.S.C. § 10761, have always been considered essential to preventing price discrimination and stabilizing rates."). Congress mandated that tariff rates provide for a "reasonable profit" for carriers (49 U.S.C. § 10701(e)).

without the prior consent of the ICC. *See* 49 CFR §§ 1321.1–1321.7 (1992). The MC–208 Regulations threatened the Trustee with civil and/or criminal penalties if he sought to disregard their mandate.

The MC–208 Regulations were invalidated by the courts on multiple grounds. Judge Robert Potter of the District Court for the Western District of North Carolina enjoined enforcement of the MC–208 Regulations on the ground that they violated the automatic stay of 11 U.S.C. § 362(a)(3). *Langdon M. Cooper, Trustee v. Interstate Commerce Commission, et al.,* 150 B.R. 912 (W.D.N.C. 1992). *See* also *Gumport, Trustee v. ICC,* 147 B.R. 770 (Bankr.C.D.Cal.1992). In addition, in a Hobbs Act proceeding in which the Trustee was a party, the Third Circuit Court of Appeals invalidated the MC–208 Regulations on the ground that they violated the ICA. *White, supra.*

In 1990, shortly after the Supreme Court's decision in *Maislin,* the ICC urged Congress to enact S. 2933. That bill would have overruled *Maislin* by authorizing the ICC to ban freight undercharge claims as an "unreasonable practice" under the Interstate Commerce Act.[4] S. 2933 would have thereby wiped out the freight undercharge claims of all motor carriers, operating and non-operating. Congress never enacted S. 2933.

Beginning no later than 1991, the ICC lobbied Congress to enact a series of more limited anti-freight undercharge bills. These bills included S. 1675 in 1991, and S. 412 and H.R. 2121 in 1993. Instead of applying uniformly to all motor carriers, all of these bills targeted freight undercharge claims asserted only by bankrupt and other non-operating motor carriers.

In June 1993, the Senate Committee on Commerce, Science and Transportation favorably reported S. 412 which purported to limit the right of a "motor carrier" to collect freight undercharges if the carrier was "no longer transporting property...." The report on S. 412 by the Senate Committee on

Commerce, Science and Transportation stated that the bill:

> ... establish[ed] a statutory procedure for resolving disputes resulting from efforts by trustees for bankrupt motor carriers or nonhousehold goods forwarders to collect additional amounts for past transportation provided, in certain circumstances where the agreed-upon rate or charge allegedly was not properly or timely filed in a tariff with the Interstate Commerce Commission....

S. 412 as reported in June 1993 did not include any provision that exempted Title 11 (the Bankruptcy Code) from the provisions of S. 412.

In June 1993, the Subcommittee on Surface Transportation of the House Committee on Public Works and Transportation conducted a hearing on H.R. 2121 that, like S. 412, purported to limit the right of a "motor carrier" to collect freight undercharges if the carrier was "no longer transporting property...." Like S. 412 as reported by the Senate committee in June 1993, H.R. 2121 in June 1993 did not contain any provision that exempted Title 11 (the Bankruptcy Code) from the provisions of H.R. 2121.

Prior to 1993, the House Committee on the Judiciary had indicated that it would seek to review the bankruptcy ramifications of proposed freight undercharge legislation under consideration by the House Committee on Public Works and Transportation. The "Title 11 exemption" that now appears in Section 9 of the NRA did not appear in H.R. 2121 until November 1993.

On November 10, 1993 Chairman Jack Brooks of the House Committee on the Judiciary requested a sequential referral of H.R. 2121 for review by the Judiciary Committee. In requesting a sequential referral, Chairman Brooks explained:

> The Committee on the Judiciary has had no opportunity whatsoever to review [H.R. 2121] and consider its impact on the bankruptcy system, administrative law and the jurisdiction of the Federal courts. Such an

---

**4.** *See Hearing on Interstate Commerce Commission Freight Motor Oversight before the Senate Committee on Commerce, Science, and Transportation,* 102nd Cong., 1st Sess., p. 20 (September 19, 1991) (testimony of ICC Chairman Philbin that the ICC "expressed support for" S. 2933, which "would have overruled the *Maislin* decision").

opportunity is essential if the Committee is to carry out its mandate to ensure the integrity and consistency of the Code in these areas of the law.

By letter dated November 15, 1993 Representative Norman Mineta, a principal sponsor of H.R. 2121 and the Chair of the House Committee on Public Works and Transportation, confirmed to the Chair of the Judiciary Committee that:

> Because of your Committee's jurisdiction over Federal courts and bankruptcy, I recognize your right to request a sequential referral of H.R. 2121. However, and in accordance with your letter, I am pleased that we were able to agree on language clarifying that we do not intend in this legislation to affects [sic] either the Bankruptcy Code or the jurisdiction of the bankruptcy courts. Based on our agreement, it is my understanding that you will not pursue your request for a sequential referral.

At the request of the Chair of the House Judiciary Committee, the above-quoted letter from Representative Mineta was included in full in the November 15, 1993 report on H.R. 2121 by the House Committee on Public Works and Transportation.

Also on November 15, 1993 the House Committee on Public Works and Transportation favorably reported H.R. 2121 as amended. As amended, H.R. 2121 contained a new section 9, which provided:

> Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting applicability of title 11, United States Code, relating to bankruptcy, or the Employment Retirement Income Security Act of 1974.

On November 15, 1993 the text of Section 9 was further amended to provide as follows:

Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

On November 15, 1993 on the floor of the House, Mr. Mineta, the principal sponsor of H.R. 2121 and the Chair of the House Committee of Public Works and Transportation, explained the above-quoted revised (and final) version of Section 9 of H.R. 2121:

> Finally, Mr. Speaker, I would note that we have made a few technical and clarifying amendments to the bill today. Among them, we are clarifying in section 9 of the bill that we do not intend in this legislation to affect either the bankruptcy code or the jurisdiction of the bankruptcy courts, matters over which our committee does not have jurisdiction.

The text of H.R. 2121 as amended was thereafter substituted for the text of S. 412. As amended, it was enacted by Congress and on December 3, 1993 was signed into law by the President as Public Law No. 103–180, *i.e.*, the NRA. The House Judiciary Committee never held hearings on the NRA before its enactment.

The NRA purports to restrict the right of a motor carrier of property, or its trustee in bankruptcy, to enforce claims to recover freight undercharges—*but only* in the event that the carrier ceases to transport property for compensation, or transports property for the purpose of evading the NRA.[5] The provisions of Section 2(e) of the NRA eliminate virtually all of Bulldog's freight undercharge claims and make it an unreasonable practice under the NRA for the Trustee to attempt to

---

5. Section 2(a) of the NRA amends 49 U.S.C. § 10701(f) to provide that a shipper has an option to settle a freight undercharge claim at between 0–20% of its value, provided that:

> [the freight undercharge] claim is made by a motor carrier of property ... providing transportation subject to the jurisdiction of the [ICC] under subchapter II of chapter 105 of this title ... or by a party representing such a carrier ... [and]

> (A) the carrier ... is no longer transporting property or is transporting property for the purpose of avoiding the application of this subsection....

Sections 2(b)–(c) and (e)–(g) further modify the right of any carrier which is not operating to enforce its freight undercharge claim.

pursue collection of such claims.[6] The provisions of Section 2(f) of the NRA allow shippers who have previously settled with the Trustee under settlements approved by this Court to avoid or set aside those settlements if they "were agreed to as a result of fraud or coercion."[7] The provisions of Section 8 of the NRA state that the ICC has jurisdiction over and shall resolve disputes relating to contract or common carrier capacity—in the face of 49 U.S.C. § 11706(a) under which original and exclusive jurisdiction of freight undercharge matters is vested in the courts, in the face of Title 28 which grants at least original (if not original and exclusive) jurisdiction of such matters to the district court, and in face of the NRA's own Section 9 which provides that the NRA shall not be construed as limiting or otherwise affecting Title 28.[8]

The ICC is now entering orders (decisions) in the reparations actions pending before it which were instituted by the numerous defendants in the Trustee's freight undercharges adversary proceedings. These orders reopen the record in each reparations action to permit each shipper to seek relief under the NRA. The ICC states in each order that it "... expects many undercharge cases now pending on its docket to be resolved under the section 2(e) alternative procedure." The ICC's order permits the parties to submit evidence and argument under the NRA. In the Defendant's reparations action such an order was issued by the ICC on December 21, 1993.

Many of the defendants represented at the consolidated hearings in these adversary proceedings instituted by the Trustee to collect freight undercharges have already sought summary judgment against the Trustee based on Section 2 of the NRA, or an expansion of this Court's prior modification of the Section 362 stay (which allowed the defendants to raise their rate reasonableness claims before the ICC) to allow them additionally to request the ICC for relief under the NRA. Since the ICC has reopened the record in its reparations' proceedings, it is calling for the defendants before this Court to assert claims under the NRA in that forum.

On March 21, 1991, this Court entered an Order approving a freight audit contract, whereby Trans–Allied Audit Company ("Trans–Allied") was to conduct an audit of Bulldog's freight bills for the purpose of determining whether or not those freight bills had been properly rated pursuant to the common carrier tariffs which Bulldog had on file with the ICC and various state regulatory agencies.

As part of its audit of Bulldog's freight bills, Trans–Allied reviewed the common carrier tariffs which were used to bill the Defendant for services rendered by Bulldog for the three years prior to Bulldog's bankruptcy petition. Trans–Allied, in its audit, discovered that Bulldog had originally billed the Defendant pursuant to the rates contained tariffs designated ICC BDOQ 402–C and 402–D ("Tariff 402"). This interstate tariff was used on all shipments, including those which moved solely within South Carolina. Tariff

---

**6.** Section 2(e) of the NRA provides in relevant part:

... it shall be an unreasonable practice (under 49 U.S.C. § 10701) for a motor carrier of property ... or a party representing such carrier ... to attempt to charge or to charge for a transportation service provided before September 30, 1990, the difference between the applicable rate that is lawfully in effect pursuant to a (filed tariff) ... and the negotiated rate for such service if the carrier is no longer transporting property ... or is transporting property ... for the purposes of avoiding the application of this subsection.

**7.** Section 2(f) of the NRA provides:

Any claim that, but for this subsection, would be subject to any provision of this Act (includ-

ing any amendment made by this Act) and that was settled by mutual agreement of the parties to such claim, or resolved by a final adjudication of a Federal or State court, before the date of enactment of this Act shall be treated as binding, enforceable, and not contrary to law, unless such settlement was agreed to as a result of fraud or coercion.

**8.** Section 9 of the NRA reads as follows:

Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to jurisdiction. of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

402 on its title page contained the following language:

> Restrictions: Between the facilities of E.I. Du Pont de Nemours & Co., (except classes A & B explosives, household goods as described by the commission, commodities in bulk, commodities requiring the use of special equipment).

The tariff title page also listed the phrase "MC–118420 Sub 11" (hereinafter referred to as "Sub 11") immediately beneath the words "Bulldog Trucking, Inc." The parties agreed that MC–118420 Sub 11 is the ICC certificate which authorized Bulldog to perform the interstate transportation of the Defendant's various commodities (described as "general commodities"), between the Defendant's facilities, on the one hand, and on the other, points in the United States, east of the Mississippi River. The parties also agreed that the ICC certificate was not restricted to freight moving solely between the Defendant's facilities but allowed Bulldog to handle freight from and to the Defendant's facilities.

Upon reviewing Bulldog's freight bills, Trans–Allied determined that a large number of these shipments were not movements between the Defendant's facilities or were purely intrastate movements within the state of South Carolina.

Trans–Allied thereupon re-rated the interstate shipments which were not between the facilities of the Defendant pursuant to the provisions contained in Bulldog's other interstate common carrier tariffs denominated ICC BDOQ 406–D and 406–E ("Tariff 406"). Tariff 406 contains a notation on its title page which indicated that Tariff 406 would only apply, "when no commodity rates (other than distance commodity rates) are published to apply from and to the same points over the same route." Trans–Allied rebilled the Defendant in the approximate amount of $1.6 million, which represented the difference between the rates originally paid by the Defendant (Tariff 402 rates), and those rates Trans–Allied claims should apply to the shipments in question (Tariff 406 rates). Trans–Allied also re-rated 613 shipments totalling approximately $86,030.00, representing those shipments which moved solely with South Carolina. The shipments were rated pursuant to the applicable South Carolina tariffs.

Shortly after demand was made by Trans–Allied on behalf of the Trustee, for payment of the asserted undercharges, the Defendant filed a motion with this Court, seeking relief from the automatic stay. The Defendant in its motion claimed that the tariffs involved were ambiguous and required the ICC to issue a declaratory order, interpreting the scope and application of the respective tariffs. In support of this position, the Defendant presented the Court with several affidavits. The affiants claimed that notwithstanding the "between the facilities" restriction on the title page of Tariff 422, it was the Defendant's and Bulldog's intent to have the rates contained in Tariff 402 apply to all the Defendant's shipments. The Defendant also argued that the listing of Sub 11 (which is not restricted to inter-facility moves) in the title page of Tariff 402 supports this interpretation and makes the restriction limiting the application of Tariff 402 to inter-facility moves ambiguous. The Defendant also presented the testimony of an affiant who claims $203,702.94 of the $1.5 million of alleged interstate undercharges were movements between the Defendant's leased facilities and the Defendant's owned facilities and therefore, should have been rated under Tariff 402. With regard to the interstate moves the Defendant claimed an unspecified portion of these movements were to warehouse locations for ultimate destinations out of state. The Defendant claims that this unspecified number of shipments should therefore be considered interstate in nature and not rated pursuant to the South Carolina tariffs.

The Trustee countered the Defendant's Motion with the affidavit of the President of Trans–Allied. The Trustee and his witness argued that the intention of the parties is irrelevant when a Court is asked to interpret an unambiguous and duly published tariff. The Trustee argued further that the reference to the operating authority contained in Sub 11 (which he admits is broader than the restriction contained in Tariff 402), does not create any ambiguity. Rather, the Trustee asserted that the operating authority merely informs the tariff reader that Bulldog held a

sufficiently broad certificate allowing Bulldog to provide the services contemplated in Tariff 402. The Trustee further argued that there is no ambiguity since the scope of the rates contained in Tariff 402 does not exceed Bulldog's operating authority. The fact that the tariff is restricted to inter-facility moves, the Trustee asserted, does not create any conflict, but merely gives meaning to the word "restrictions." Otherwise, the Trustee argues that the use of the word "restrictions" would have to be read out of the tariff.

As is more fully explained below, the Court grants Bulldog's motion for summary judgment and denies the Defendant's Cross–Motion for Summary Judgment. The Court specifically finds that the restriction on the title page of Tariff 402 is not ambiguous. The restriction reads "between the facilities" of the Defendant, which can only mean that the tariff applies to shipments which originate at one of the Defendant's facility destined for another of the Defendant's facilities. Any other interpretation would be contrary to the plain meaning of the word "between."

In addition, the Court specifically finds that the reference to Bulldog's Sub 11 authority does not create an ambiguity, and it does not expand the scope or application of Tariff 402. The reference to Bulldog's Sub 11 authority simply indicates that Bulldog is authorized by the ICC to act as a common carrier for those shipments covered by the tariff. That the authority is broader than the tariff is irrelevant. The reference simply means that Bulldog is authorized to perform the shipments covered by the tariff and the fact that Bulldog's authority covers more than just inter-facility shipments does not expand the application of the tariff.

### III. *CONCLUSIONS OF LAW*

#### A. *JURISDICTION*

■ The Trustee's claims against the Defendant in this adversary proceeding are "related to" the Bulldog bankruptcy case, and this Court has original although not exclusive jurisdiction of the subject matter of this ad-

versary proceeding. *See* 28 U.S.C. § 1334, which states:

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

. . . .

(d) The district court in which a case under Title 11 ... is commenced or is pending shall have the exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of the property of the estate.

■ Heretofore the district courts, and hence the bankruptcy courts, clearly have had jurisdiction of these cases, *i.e.*, these adversary proceedings to recover freight undercharges, under 49 U.S.C. § 11706(a), 28 U.S.C. §§ 1334 and 157. The NRA by its terms makes no changes in this law. It therefore continues to be the law that if the courts desire, and if the courts believe the ICC can aid them in deciding specific issues, the courts may but are not required to "refer" these cases to the ICC under the doctrine of primary jurisdiction.[9] *Peter C. Reiter v. Langdon M. Cooper*, 507 U.S. ——, ——, 113 S.Ct. 1213, 1219–20, 122 L.Ed.2d 604, 617 (*"Reiter"*). The operation of the doctrine of primary jurisdiction has not been altered by the NRA.

This Court has tried hundreds of freight undercharge cases in numerous carrier bankruptcies, has not yet encountered an issue that required the advice of the ICC, and the Court has heretofore uniformly denied requests of defendants to stay a case to permit them to file administrative complaints before the ICC. Most issues which arise in the pleadings in these cases can readily be decided by the district and bankruptcy courts.

---

**9.** Technically "referral" is a misnomer. The court merely modifies the Section 362 stay and stays the adversary proceeding to enable a party to file an administrative complaint before the agency. *Reiter*, 507 U.S. at ——, 113 S.Ct. at 1220, n. 3, 122 L.Ed.2d at 617, n. 3.

Indeed, the majority of these freight undercharge cases have thus far been candidates for summary judgments. Material facts are rarely in dispute, and the application of the law is clear and well established.

## B. *BY REASON OF THE ANTI–FOR-FEITURE PROVISIONS OF 11 U.S.C. §§ 541(c)(1) and 363(l), SECTIONS 2(a)–(c) AND (e)–(g) OF THE NRA CANNOT BE APPLIED TO THE TRUSTEE OF BULLDOG*

### 1. *Introduction*

Section 541(a) of the Bankruptcy Code defines what comprises the property of a debtor's bankruptcy estate.[10] Sections 541(c)(1) and 363(l) of the Bankruptcy Code protect bankruptcy estates from non-bankruptcy laws that attempt to cause a forfeiture, modification or termination of property rights of a debtor in bankruptcy based on its financial condition.

Section 541(c)(1) provides in relevant part:

(c)(1) ..., an interest of the debtor in property becomes property of the [debtor's bankruptcy] estate ... notwithstanding any provision in applicable nonbankruptcy law—

> (B) that is conditioned on the insolvency or financial condition of the debtor, ... and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 363(l) provides that the "trustee may use, sell, or lease property" of the bankruptcy estate "notwithstanding any provision in a contract, lease or applicable law

that is conditioned on the insolvency or financial condition of the debtor ..."

Sections 541(c)(1) and 363(l) are two of several provisions of the Bankruptcy Code that invalidate forfeitures and restraints on use by a trustee of a debtor's property based on the debtor's insolvency or financial condition. *See* 11 U.S.C. §§ 363(l), 365(e)–(f), 541(c)(1), 545 and 1142;[11] *see, also, In re Taylor Manufacturing, Inc.*, 6 B.R. 370, 371 (Bankr.N.D.Ga.1980) (bankruptcy default clause was unenforceable against lessee); *In re Tom Stimus Chrysler–Plymouth, Inc.*, 134 B.R. 676, 679 (Bankr.M.D.Fla.1991) (Section 365 precluded enforcement of state law that provided that car dealership abandoned its franchise if it stopped doing business for 10 consecutive days); *In re Peaches Records and Tapes, Inc.*, 51 B.R. 583, 590 (9th Cir. BAP 1985) (Section 365 precluded enforcement of agreement that restricted assignment of lease if debtor ceased to do business on premises).

 The anti-forfeiture provisions of the Bankruptcy Code abolish the pre-Code practice that permitted third parties to strip debtors of their assets by means of *ipso facto* bankruptcy clauses. *See, e.g., Finn v. Meighan*, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624 (1945) (enforcing *ipso facto* clause in lease). Even under pre-Code practice, it was the policy of the bankruptcy courts to interpret such clauses narrowly "so as not to deprive the estate of property which may turn out to be a valuable asset." *Finn*, 325 U.S. at 301, 65 S.Ct. at 1149.

 In abolishing such forfeitures, Congress did not limit its attention to clauses in

---

**10.** Under 11 U.S.C. § 541(a), every interest of a debtor in property at the commencement of the bankruptcy case becomes property of the debtor's bankruptcy estate. Under 11 U.S.C. § 323(a), the trustee represents the estate. This Court has previously expressly determined that the property of the Bulldog estate includes its right to recover freight undercharges.

**11.** 11 U.S.C. § 365(e)(1) provides that an executory contract or unexpired lease "may not be terminated or modified ... solely because of a provision in a contract or lease that is conditioned on—(A) the insolvency or financial condition of the debtor...." Section 365(f)(1) supplements § 365(e)(1) and generally makes unen-

forceable a provision "in applicable law that prohibits, restricts, or conditions the assignment" of an executory contract or unexpired lease.

11 U.S.C. § 545 provides that "(t)he trustee may avoid the fixing of a statutory lien on property of the debtor to the extent that such lien—(1) first becomes effective against the debtor— ... (E) when the debtor's financial condition fails to meet a specified standard(.)"

11 U.S.C. § 1142(a) provides that a reorganization plan can be implemented "[n]otwithstanding any otherwise nonbankruptcy law, rule, or regulation relating to financial condition...."

leases and contracts. Instead, the express terms of 11 U.S.C. § 541(c)(1) also invalidate any "applicable nonbankruptcy law" that causes a forfeiture of the debtor's property in violation of Section 541(c)(1) of the Bankruptcy Code. The provisions of Section 363(*l*) are even broader—that section invalidates any "applicable law" that works a forfeiture. Similarly, Congress did not limit the broad sweep of Sections 541(c)(1) and 363(*l*) of the Bankruptcy Code to attempts to cause forfeitures based on the "insolvency" or "bankruptcy" of the debtor. The express terms of Sections 541(c)(1) and 363(*l*) of the Bankruptcy Code apply equally to laws conditioned *either* on the insolvency, bankruptcy *or* "financial condition" of the debtor. Further, Congress did not limit Sections 541(c)(1) and 363(*l*) of the Bankruptcy Code to invalidating only "forfeitures" of a debtor's property. Instead, Sections 541(c)(1) and 363(*l*) of the Bankruptcy Code invalidate *any* "forfeiture" *or* "modification" *or* "termination" of a debtor's interest in property. Thus, the Defendant's argument for a narrow reading of Sections 541(c)(1) and 363(*l*) must fail.

### 2. *11 U.S.C. §§ 541(c)(1) and 363(l) Preclude Enforcement Of Sections 2(a)–(c) And (e)–(g) of the NRA Against the Trustee*

■ Under 11 U.S.C. § 541(c)(1) the interest of the debtor Bulldog in its freight undercharge claims became property of the Bulldog bankruptcy estate on December 11, 1990 when it filed its bankruptcy petition, and no provision of the NRA alters this fact because Section 541(c)(1) makes wholly inapplicable a law (such as the NRA) that meets three conditions: (1) the law is an "applicable nonbankruptcy law" that (2) "is conditioned on the insolvency or financial condition of the debtor" and that (3) "effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property." *See* 11 U.S.C. § 541(c)(1).

■ Once an interest in the freight undercharge claims becomes property of the estate, Section 363 of the Bankruptcy Code allows the Trustee to "use, sell or lease" such property. No provision of the NRA alters this fact either. Section 363(*l*) of the Bank-

ruptcy Code makes wholly inapplicable a law (such as the NRA) that meets these three conditions: (1) the law is an "applicable law" that (2) "is conditioned on the insolvency or financial condition of the debtor" and that (3) "effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property." *See* 11 U.S.C. § 363(*l*).

The NRA meets all three of these conditions in both 11 U.S.C. § 541(c)(1) and 11 U.S.C. § 363(*l*):

#### a. *Bulldog's Freight Undercharge Claims Are Property of the Debtor and its Bankruptcy Estate*

Bulldog's right to recover freight undercharges constitutes "property" within the protection of 11 U.S.C. § 541. *Cooper, Trustee v. ICC, supra,* at 914 ("The filed rate doctrine creates a property right in [Bulldog] for any freight shipped at a rate less than the tariff rate filed with the ICC at the time of the shipment.... The Trustee's rate undercharge claims, therefore, are property of the estate and are protected by the automatic stay.") See also *Gumport, Trustee v. ICC,* 147 B.R. 770 (Bankr.C.D.Cal.1992) ("The Trustee's claims for freight undercharges . . . are property of this bankruptcy estate"), *citing In re Crysen/Montenay Energy Co.,* 902 F.2d 1098 (2d Cir.1990) and *In re Best Refrigerated Express, Inc.,* 1991 Fed.Carr.Cas. (CCH) ¶ 83,624 (Bankr.D.Neb.1991); *see also 4 Collier on Bankruptcy* ¶ 541.01 at 541–5 (15th ed. 1993) (property of the debtor's estate under 11 U.S.C. § 541 includes the debtor's "causes of action").

This result follows from the broad language of 11 U.S.C. § 541(a), which vests in the bankruptcy estate all "legal or equitable interests of the debtor in property" as of the commencement of the debtor's bankruptcy case. The Supreme Court has stated that Section 541(a)(1)'s "scope is broad," and that "Section 541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code." *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2314, 76 L.Ed.2d 515 (1983) (requiring IRS to return

to bankruptcy estate property of debtor that was seized prior to the bankruptcy).

### b. *The NRA Is An Applicable Nonbankruptcy Law*

▮ The NRA is an "applicable law" because it purports to apply to all motor carriers transporting freight for compensation, *regardless* of whether the carriers are in bankruptcy. The NRA is an "applicable nonbankruptcy law" because by its own terms it provides explicitly in its Section 9 that it does *not* amend Title 11 (the Bankruptcy Code). The NRA is therefore both "applicable law" and "applicable nonbankruptcy law" within the meaning of 11 U.S.C. §§ 541(c) and 363(*l*).

▮ The Supreme Court has determined that the phrase "applicable nonbankruptcy law" in Section 541 of the Bankruptcy Code includes federal statutory law. "Plainly read, the provision (applicable nonbankruptcy law) encompasses any relevant nonbankruptcy law, including (any) federal law ..." *Patterson v. Shumate*, 504 U.S. ——, ——, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992). Similarly, it is obvious that the broader term "applicable law" in Section 363(*l*) of the Bankruptcy Code would also encompass any federal law.

### c. *Sections 2(a)–(c) And (e)–(g) of the NRA Are Conditioned On The Financial Condition Of Bulldog*

▮ Sections 2(a)–(c) and (e)–(g) of the NRA apply by their terms *only* to (1) a "motor carrier of property" that is (2) providing transportation subject to the jurisdiction of the [ICC] under subchapter II of chapter 105 of this title [*i.e.*, title 49], provided that (3) the motor carrier "is no longer transporting property, or is transporting property for the purpose of avoiding the application" of the NRA.[12]

There is no merit to any argument by the Defendant and the United States that a carrier's lack of revenues from current operations relates only to its "operating condition" as opposed to the carrier's "financial condition." Revenues are part of a company's "financial condition" even if they also relate to the company's "operations." Anyone who has ever read a financial statement knows that a company's revenues from operations are reflected on the statement of income section of the company's financial statement—the document that depicts a company's "financial condition."

▮ As explained below, both the text and legislative history of these challenged provisions of the NRA show that they apply only to motor carriers having a specified "financial condition" within the meaning of 11 U.S.C. §§ 541(c)(1) and 363(*l*)[13]: namely a lack of revenues generated from the ongoing transportation of property.

### (i). *The Language of Sections 2(a)–(c) and (e)–(g) of the NRA Shows That Application of these Sections is Conditioned on the Financial Condition of the Motor Carrier*

▮ The words *"motor carrier"* and *"no longer transporting property"* are the key statutory words in the NRA that condition the application of Sections 2(a)–(c) and (e)–(g) on the financial condition of Bulldog and other defunct motor carriers of property:

(1) *"Motor carrier"* is statutorily defined in 49 U.S.C. § 10102(13)–(15). *See* 49 U.S.C. § 10102(13). These provisions specify that "motor carrier" means either a motor common carrier *"for compensation"* (49 U.S.C. § 10102(13)–(14)), or a motor contract carrier *"for compensation"* (49 U.S.C. § 10102(13)

---

**12.** Certain provisions of the NRA apply uniformly to all motor carriers of property, and the Trustee does *not* contend that 11 U.S.C. § 541(c)(1) makes those non-discriminatory provisions unenforceable.

**13.** 11 U.S.C. §§ 541(c)(1) and 363(*l*) by their terms apply to applicable nonbankruptcy laws conditioned on the "insolvency *or* financial con-

dition" of the debtor. (Emphasis added.) 11 U.S.C. § 102(5) specifies that the term "or" is *"not* exclusive." (Emphasis added.) Accordingly, the challenged provisions of the NRA fall within the scope of 11 U.S.C. §§ 541(c)(1) and 363(*l*) regardless of whether they are conditioned on the insolvency of the motor carrier, as opposed to its financial condition.

and (15)).[14]

(2) Thus, a "motor carrier" of property that "is no longer transporting property" within the meaning of Sections 2(a)–(c) and (e)–(g) of the NRA means a motor carrier of property *for compensation* that is no longer transporting property *for compensation.* In plain english, this statutory language means "a motor carrier that is no longer generating revenues from current transportation of property." By definition, any such motor carrier has a "financial condition" characterized by a lack of revenues from ongoing transportation of property.[15]

(ii). *The Legislative History of the NRA Confirms That Its Challenged Provisions Are Conditioned on the Financial Condition of Bulldog and Other Defunct Motor Carriers*

In the House debate on the NRA, Congressman Norman Y. Mineta of California who was chief sponsor of the NRA, and who is the Chairman of the House Committee on Public Works and Transportation, which reported the bill favorably to the House floor, noted that the negotiated rates "problem" had been created when trucking companies "went into bankruptcy and ceased operation, and trustees operating on behalf of the trucking company brought claims against the shipping business ..." 139 Cong.Rec. H9602 (daily ed. November 15, 1993).

The legislative history of the challenged provisions of the NRA confirms that the sole purpose of these provisions is to limit the freight undercharge claims of bankrupt and other financially defunct carriers. The transcript of the recent hearings on H.R. 2121, which became S. 412, and hence the NRA, compels this conclusion. That transcript contains extensive discussion of the problems caused by undercharge claims asserted by trustees of bankrupt motor carriers.[16] Similarly, the House committee report on H.R. 2121 (which, as stated, became S. 412, which is the NRA) explains:

**14.** 49 U.S.C. § 10102(13) provides that "motor carrier" means "a motor common carrier and a motor contract carrier."

49 U.S.C. § 10102(14) provides that "motor common carrier" means "a person holding itself out to the general public to provide motor vehicle transportation *for compensation* over regular or irregular routes, or both." (Emphasis added.)

49 U.S.C. § 10102(15)(B) provides that a "motor contract carrier" of property means "a person providing motor vehicle transportation of property *for compensation* under continuing agreements with one or more persons...." (Emphasis added.)

49 U.S.C. § 10521, which appears in subchapter II of chapter 105 of Title 49 (*see* Section 2(a) of H.R. 2121), gives the ICC jurisdiction "over transportation by motor carrier," which, by reason of 49 U.S.C. §§ 10102(13)–(15), means "transportation by motor carrier *for compensation.*" (Emphasis added.)

Contrary to the argument of the Defendant at the consolidated hearings, Congress' use of the phrase "for compensation" to distinguish public and private carriage does not preclude application of the plain meaning to that phrase. Regardless of what else it might mean, such a phrase obviously concerns financial condition.

**15.** For such defunct carriers, the recovery of freight undercharges from former customers will always be a more substantial asset than the nonexistent revenues from ongoing operations. Further, only a defunct carrier or its trustee is likely to sue the favored customer who extracted the illegal discount from the carrier. In contrast, an operating carrier will forebear from suing in order to obtain the customer's future trade.

**16.** *See Hearing on the Negotiated Rates Issue and Proposed Legislative Solutions Thereto Before the House Subcommittee on Surface Transportation of the Committee on Public Works and Transportation,* 103rd Cong., 1st Sess. (June 15, 1993) (*"Hearings"*). During these hearings on H.R. 2121, which, as stated, became S. 412 (and the NRA), this exchange took place between Representative Laughlin and Mortimer Downey, Deputy Secretary of the U.S. Department of Transportation:

REP. LAUGHLIN: .... I appreciate all of the legislation pending on this issue—the only entities that it applies to are the bankrupt carriers; is that correct?
MR. DOWNEY: That is correct.

\* \* \* \* \* \*

MR. DOWNEY: .... These carriers are bankrupt. They are no longer in business....
*Hearings* p. 120. Similarly, in endorsing H.R. 2121, Thomas Donohue, the President of the American Trucking Association, stated that the provisions of H.R. 2121 are applicable "[o]nly to claims by defunct (i.e. bankrupt) carriers" (*Hearings;* p. 133). Representative Jennifer Dunn, a co-sponsor of H.R. 2121, explained to the Subcommittee that the legislation addressed "a legal morass where bankrupt trucking companies are suing businesses, large and small" (*Hearings;* p. 120).

*PURPOSE AND SUMMARY*

The purpose of H.R. 2121, as reported, is to provide a statutory process for resolving disputes for claims involving negotiated transportation rates *brought about by trustees for non-operating motor carriers for past transportation services.* (emphasis added).

See H.Rep. No. 359, 103rd Cong., 1st Sess., at 7 (1993), U.S.Code Cong. & Admin.News 1993, p. 2534. This same committee report describes how the freight undercharge disputes resolved by the bill arose:

If a motor carrier ceases operation and files for bankruptcy, the receiver or trustee frequently retains an auditor to search the records of the carrier for instances in which the rates billed and collected were lower than the applicable rates on file at the ICC. When these discrepancies are discovered, the receiver or trustee then files a collection action to recover the difference from the shipper.

H.Rep. No. 359, *supra* at 8, U.S.Code Cong. & Admin.News 1993, p. 2535. The quoted portions of the committee report remove any doubt that the NRA targets freight undercharge claims belonging to trustees of bankrupt carriers.

Further, the NRA is essentially the same as S. 1675, which was introduced in 1992. The committee report of that bill states:

*Summary of Major Provisions*

As reported, [the bill] would do the following: (1) It would create a procedure for resolving disputes based on the attempt to collect undercharges from shippers or other persons *by trustees for bankrupt trucking companies [or] freight forwarders. . . .* Pursuant to the undercharge resolution procedures included in the [bill], shippers or other persons facing additional charges for past shipments . . . could satisfy these obligations by showing that the carrier or forwarder *is no longer in business. . . .* (emphasis added).

S.Rep. No. 359, 102d Cong., 2d Sess., at 5 (1992). Indeed, the first page of the same report states that the bill is designed to address claims asserted by "trustees for bankrupt motor carriers or nonhousehold goods forwarders" to recover freight undercharges. S.Rep. No. 359 at 1 [17].

In summary, both the text and history of the NRA confirm that its anti-undercharge provisions are "conditioned on the . . . financial condition of the debtor" within the meaning of Sections 541(c) and 363(*l*) of the Bankruptcy Code because these provisions of the NRA only apply to bankrupt and other carriers that lack revenues from ongoing transportation of property.

Failure to acknowledge this obvious point would have drastic consequences far beyond Bulldog's bankruptcy case. Sections 541(c)(1) and 363(*l*) of the Bankruptcy Code protect equally all debtors in bankruptcy. If this Court were to give a narrow interpretation of the words "financial condition" today, it would mean that tomorrow every creditor and governmental entity would seek to enforce *ipso facto* forfeitures against debtors in bankruptcy on the ground that they no longer have revenues and/or income and/or business operations. That is not the law, and this Court cannot ignore the clear provisions of Sections 541(c)(1) and 363(*l*) of the Bankruptcy Code and allow a revival of the harsh forfeiture law that Congress abolished.

d. *The Challenged Provisions of the NRA Modify and Give Shippers an Option to Modify the Rights of the Bulldog Trustee to Enforce the Debtor's Freight Undercharge Claims*

 11 U.S.C. §§ 541(c)(1) and 363(*l*) trump applicable non-bankruptcy laws that

---

17. In June 1993, the Senate first passed S. 412, which closely resembled its final version (adopting H.R. 2121 as amended) and restricted the freight undercharge claims of motor carriers of property that were no longer transporting property. The Senate committee report on S. 412 states on its first page:

The bill, as reported, is intended to alleviate the freight motor carrier "undercharge" litigation crisis by establishing a statutory procedure for resolving disputes resulting from efforts by *trustees for bankrupt motor carriers or nonhousehold goods forwarders* to collect additional amounts for past transportation provided. . . . (emphasis added).

S.Rep. No. 79, 103rd Cong., 1st Sess., at 1 (1993). Thus, the initial version of S. 412 (which, as stated, closely resembled the final version), like S. 1675 and H.R. 2121, contemplated that a non-operating motor carrier would be a bankrupt or financially defunct carrier.

cause *either* a "forfeiture, modification, *or* termination*" of the debtor's interest in its property. Thus, the broad language of Sections 541(c)(1) and 363(*l*) of the Bankruptcy Code makes unenforceable a law that causes a "modification" of the debtor's property rights *even if* no "forfeiture" occurs. In violation of Sections 541(c)(1) and 363(*l*) of the Bankruptcy Code, Section 2 of the NRA attempts to effect a forfeiture, modification and termination of the freight undercharge claims of non-operating carriers as follows:

a. Sections 2(a) and (b) of the NRA give shippers an option[18] to satisfy the freight undercharge claims of non-operating carriers at 0–20% of the amount owed, and provide that certain small business concerns have no liability for freight undercharges;

b. Section 2(c) of the NRA makes it apply retroactively to all of Bulldog's pending claims;

c. Section 2(e) of the NRA retroactively terminates and forfeits specified pre-October 1990 freight undercharge claims of non-operating carriers by declaring pursuit of such claims to be an "unreasonable practice," and Section 2(e) thereby purports to overrule the Supreme Court's decision in *Maislin* (but only as to non-operating carriers). Since virtually all of Bulldog's freight undercharge claims arose prior to October 1990, they would be completely eliminated by Section 2(e) of the NRA;

d. Section 2(f) of the NRA authorizes the avoidance of previously court-approved settlements of the freight undercharge claims of non-operating carriers on grounds of "coercion," a ground that nowhere expressly appears in Fed.R.Civ.P. 60 and Fed.R.Bankr.P. 9024; and

e. Section 2(g) of the NRA provides that operating carriers may use their costs of service to defend rate reasonableness claims of shippers, but denies Bulldog and other defunct carriers that right.

Thus, each challenged provision of the NRA either "effects" or "gives" to shippers like the Defendant in the case at bar, and/or

the ICC, "an option to effect" a "forfeiture, modification, or termination of" Bulldog's interest in its freight undercharge claims.

### 3. *Sections 363 and 541 of the Bankruptcy Code are Relevant and Applicable to the NRA*

The Defendant and the United States argue that 11 U.S.C. §§ 541(c)(1) and 363(*l*) are irrelevant because neither provision creates property rights. From this proposition, they further argue that the NRA can validly modify the Trustee's claims to recover freight undercharges. For support, they cite *In re Farmers Markets, Inc.*, 792 F.2d 1400 (9th Cir.1986). The Defendant and the United States misread *Farmers Markets*.

In *Farmers Markets*, the Ninth Circuit reviewed the ruling of a trial court that Section 541(c)(1) of the Bankruptcy Code invalidates "*any* provision in any agreement or law that restricts or conditions the transferability of a debtor's interests." *See In re Farmers Markets, Inc.*, 36 B.R. 829, 832 (Bankr.E.D.Cal.1984), *reversed*, 792 F.2d 1400 (9th Cir.1986). In other words, the trial court had concluded that Section 541(c)(1) of the Bankruptcy Code invalidates *all* otherwise applicable restrictions on a debtor's transfer or use of its property, regardless of whether they are conditioned on the debtor's financial condition, insolvency, bankruptcy, or custodianship. In reversing the trial court's broad reading of Section 541(c)(1), the Ninth Circuit explained that the trial court incorrectly read Section 541(c)(1) "to invalidate upon the commencement of bankruptcy proceedings *all* transfer restrictions on property in which the debtor holds an interest." *Farmers Markets, supra*, 792 F.2d at 1402. The Ninth Circuit did not state or suggest that the property restriction in issue was conditioned on the debtor's financial condition, nor did the Ninth Circuit mention Section 363(*l*) of the Bankruptcy Code.

Further, *Farmers Markets* did not involve 11 U.S.C. § 541(c)(1)(B), and the property

---

**18.** This option is entirely one-sided: the shipper has the option, but Bulldog and other defunct carriers do not.

restriction in issue in *Farmers Markets* was not conditioned on the financial condition of the debtor. The restriction merely provided that the debtor could not transfer its liquor license without paying certain taxes, and the debtor challenged it only under Section 541(c)(1)(A) of the Bankruptcy Code. Regardless of the financial condition of the debtor, it had to pay the taxes to transfer the liquor license. Neither Section 363(*l*) nor Section 541(c)(1)(B) had any application to that restriction.

▮▮▮▮ The nature and scope of Bulldog's property rights are determined by applicable non-bankruptcy law. *In re FCX, Inc.,* 853 F.2d 1149, 1153 (4th Cir.1988); *In re Farmers Markets, Inc.: California v. Farmers Markets, Inc.,* 792 F.2d 1400, 1402 (9th Cir.1986); *In re Polycorp Associates, Inc.,* 47 B.R. 671, 673 (Bankr.N.D.Cal.1985); *Calif. Bd. of Equalization v. MGM Liquor Warehouse,* 52 B.R. 77 (D.Minn.1985); *In re Miller: Keck v. Schuster's Restaurant,* 68 B.R. 385 (Bankr.W.D.Pa.1986); 4 *Collier on Bankruptcy* ¶ 541–02, at 541–11 (15th ed.' 1985). Bulldog's claim for freight undercharges is its property and the nature of that property is defined by the ICA. The Trustee in this adversary proceeding seeks to collect funds pursuant to the filed rate doctrine and, thus, possesses no rights greater than that given by the ICA. *See In re FCX Inc.,* 853 F.2d 1149, 1153 (4th Cir.1988); *In re Farmers Markets, Inc.* at 1403; 124 Cong. Rec. S17413 (daily ed. October 6, 1978) (statement of Sen. DeConcini).

▮▮▮▮ The NRA amends the ICA to redefine the scope of a claim for freight undercharges by creating express exceptions to the filed rate doctrine. That Congress can do this cannot be in doubt. Congress was and is the architect of the filed rate doctrine and can repeal or modify it as it deems prudent. However, Congress cannot make the application of its amendments to the ICA

conditioned on the financial condition of the carrier where that carrier is a debtor under the Bankruptcy Code.[19]

There are additional problems with the contention of the Defendant and the United States that *Farmers Markets* permits the NRA to condition a debtor's property rights on its financial condition:

*First:* If the Defendant's contention were correct, then Sections 363(*l*) and 541(c)(1) of the Bankruptcy Code would permit enforcement of laws or contract clauses that forfeit all of the assets of a debtor in the event that the debtor becomes financially troubled or insolvent. But that result conflicts with the language of Sections 363(*l*) and 541(c)(1), and would revive the antiquated and harsh rule that the Bankruptcy Code was enacted to prevent.

*Second:* The Defendant and the United States rely upon an incomplete statement of the law. They emphasize that non-bankruptcy law defines whether a debtor has a property right. That is true. However, they gloss over the fact that Sections 363(*l*) and 541(c)(1) of the Bankruptcy Code expressly limit the enforceability of statutory and contractual restrictions on such property rights to the extent that such restrictions are conditioned on the financial condition, bankruptcy, insolvency, or custodianship of the debtor. In an effort to avoid this undeniable fact, the United States cites such irrelevant cases as *In re Gull Air, Inc.,* 890 F.2d 1255 (1st Cir.1989)[20], in which the court did not address the protections of Sections 363(*l*) and 541(c)(1). Other cases cited by the Defendant and the United States are similarly inapplicable. For example, *In re Polycorp Associates, Inc.,* 47 B.R. 671 (Bankr.N.D.Cal. 1985) did not discuss whether the property restriction in issue was unenforceable by reason of being conditioned on the financial condition of the debtor. Similarly, *In re Gas-*

---

**19.** The Court notes that the issue of retroactivity is not before it. Even if Congress made the NRA applicable to all carriers without regard to financial condition, the issue of the propriety of retroactively destroying property rights of a debtor would have to be addressed.

**20.** · The *Gull Air* case involved the right of an airline to landing slots. In 1992, special amendments to the Bankruptcy Code were enacted to deal with landing slot rights. *See* 4 *Collier on Bankruptcy* ¶ 365.05(3) (15th ed. 1993). In contrast, the proponents of the NRA deliberately and knowingly avoided seeking any amendment to the Bankruptcy Code.

*light Village, Inc.*, 6 B.R. 871, 875 (Bankr. D.Conn.1980) enforced a contractual restriction on the debtor's property only *after* concluding that the restriction was *not* conditioned on the debtor's financial condition.

■ *Third:* The Defendant and the United States cannot justify the NRA's restrictions on freight undercharge claims by arguing that the NRA merely "adjusts the value" of those claims. This contention has three flaws: (a) it overlooks that Sections 363(*l*) and 541(c)(1) of the Bankruptcy Code invalidate financial condition-triggered restrictions that *modify* the debtor's property rights, even if no forfeiture or termination occurs; (b) Section 2(a) of the NRA forfeits 100% of Bulldog's freight undercharge claims against "small business concerns"; and (c) Section 2(e) invalidates 100% of Bulldog's *Maislin*-type freight undercharge claims.

*Fourth:* The facts do not square with the contention of the Defendant and the United States that Sections 363(*l*) and 541(c)(1) of the Bankruptcy Code are inapplicable on the theory that the NRA merely redefines the extent to which Bulldog's freight undercharge claims become a part of Bulldog's estate. The facts are that Bulldog's freight undercharge claims vested in Bulldog's bankruptcy estate in 1990, more than three years before the enactment of the NRA. The NRA improperly operates to remove, forfeit and modify freight undercharge claims that were previously determined by this Court and the District Court for the Western District of North Carolina to belong to the Bulldog estate.

### C. *THE CANONS OF STATUTORY CONSTRUCTION REQUIRE THE COURT TO RECOGNIZE THE INAPPLICABILITY OF THE NRA TO THE TRUSTEE*

■ It is a well-established canon of statutory construction that courts must "avoid conflicts between two statutory regimes ... that in some respect overlap." *Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490, 510, 109 S.Ct. 2584, 2596–97, 105 L.Ed.2d 415 (1989) (*P & LE R.R.*). Moreover, courts "are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Id.* quoting *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) (internal quotation marks omitted); *Andrus v. Glover Construction Co.*, 446 U.S. 608, 618–19, 100 S.Ct. 1905, 1911, 64 L.Ed.2d 548 (1980).

The Court rejects the arguments of the Defendant and the United States that it would be "absurd" or would create a "statutory conflict" or a "nullity" for this Court to determine as it has that Sections 2(a)–(c) and (e)–(g) of the NRA are rendered unenforceable as to Bulldog and its Trustee by 11 U.S.C. §§ 363(*l*) and 541(c)(1). The "absurd result", "nullity" and "statutory conflict" arguments of the Defendant and the United States implicitly assume that Congress intended to limit any provision of the Bankruptcy Code that would prevent Sections 2(a)–(c) and (e)–(g) of the NRA from stripping the Bulldog estate of its freight undercharge claims.

The facts show the opposite. The facts show that Congress did *not* intend to limit in any way the provisions of Title 11 (*i.e.*, the Bankruptcy Code), which includes 11 U.S.C. §§ 363(*l*) and 541(c)(1), and also § 362(a). This statutory interpretation is not "absurd" and does not create a "nullity" or result in any "statutory conflict":

■ *First:* Section 9 of the NRA states that it does not amend Title 11. Section 9 states: "Nothing in [the NRA] (including any amendment made by [the NRA]) shall be construed as limiting or otherwise affecting [the] application of title 11, United States Code, relating to bankruptcy...." *See* NRA § 9. This language unambiguously shows that Congress did not intend that the NRA would silently limit Sections 363(*l*) and 541(c)(1) of the Bankruptcy Code. A court should not disregard such unambiguous statutory language. *See Connecticut National Bank v. Germain*, 503 U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391, 397 (1992) ("We have stated time and again that courts must presume that a legislature says in a

statute what it means and means in a statute what it says there"); *see also F.D.I.C. v. McSweeney*, 976 F.2d 532, 538 (9th Cir.1992) *cert. denied*, —— U.S. ——, 113 S.Ct. 2440, 124 L.Ed.2d 658 (1993) ("Absent a *clear* congressional statement, preexisting statutory or common law rights or defenses are *not* displaced by federal enactment") (emphasis added). The NRA's sponsors avoided the scrutiny of the Judiciary Committee of the House by inserting Section 9 of the NRA at the last minute in November, 1993. The *sponsors* of the NRA may well have initially desired the NRA to amend title 11 and title 28 and therefore apply to bankruptcy trustees, but that version of the NRA which the entire Congress enacted by its specific language does not "limit or otherwise affect application of (title 11 or title 28)." *See Resolution Trust Corporation v. Westgate Partners, Ltd.*, 937 F.2d 526 (10th Cir.1991) ("... so long as Congress remains faithful to the Constitution, it is free to enact any number of foolish statutes. It is only where a plain language interpretation would lead to an outcome so 'absurd' that Congress clearly could not have intended the outcome, that we will employ the 'absurdity' exception in order to avoid the harsh result.")

*Second:* The NRA's legislative history confirms the unambiguous meaning of Section 9 of the NRA. The legislative history shows that Congress did not intend that the challenged provisions of the NRA would silently limit any provision of the Bankruptcy Code, which includes 11 U.S.C. §§ 363(*l*) and 541(c)(1). Section 9 of the NRA was added in November 1993, and the subsequent legislative committee report and floor statement by the bill's principal sponsor both unequivocally confirm that Congress did not intend that the NRA would silently repeal or limit any provision of the Bankruptcy Code.

*Third:* 11 U.S.C. §§ 363(*l*) and 541(c)(1) by their express terms contemplate that those provisions can and will invalidate an otherwise "applicable law" (§ 363(*l*)) or "applicable nonbankruptcy law" (§ 541(c)(1)) that seeks to modify the property rights of a debtor based on its financial condition. In enacting Sections 363(*l*) and 541(c)(1) of the Bankruptcy Code, Congress plainly under-

stood that ill-advised legislators would occasionally enact laws that discriminated against debtors based on their financial condition, and further decided that such ill-advised laws should and would be unenforceable in bankruptcy cases.

*Fourth:* The Defendant's claims of "absurdity" and "conflict" are really an attack on the anti-forfeiture and anti-discrimination policies embodied in 11 U.S.C. §§ 363(*l*) and 541(c)(1). If those statutes are "absurd" and "irrational," the remedy is to petition Congress, not this Court. The proponents of the NRA disregarded this remedy in 1993 when they circumvented the Judiciary Committee, which was and is the only legislative committee in the House that had jurisdiction to determine whether the Bankruptcy Code should be amended to prevent it from invalidating portions of the NRA. This Court cannot rewrite 11 U.S.C. §§ 363(*l*) and 541(c)(1) merely because the proponents of the NRA evaded hearings before the House Judiciary Committee.

### D. EQUITIES FAVOR IMMEDIATE DETERMINATION OF THE TRUSTEE'S CLAIMS

██ This is clearly a multiple claims case—the Trustee's claims for freight undercharges and the Defendant's counterclaim for reparations.

██ The decision in *Reiter* makes it clear that a shipper's claim for damages is a recoupment claim and that it is a "cause of action" under 49 U.S.C. § 11705(b)(3). When the trustee of a carrier in bankruptcy sues a shipper on a freight undercharge claim, any unreasonable rate claim the shipper may have must be asserted as a counterclaim before the district court, and not as defense. The Supreme Court in *Reiter* went on to say:

> One major consequence does attach to the fact that an unreasonable-rate claim is technically a counterclaim rather than a defense: A defense cannot possibly be adjudicated separately from the plaintiff's claim to which it applies; a counterclaim can be. Federal Rule of Civil Procedure 54(b) permits a district court to enter separate final judgment on any claim or coun-

terclaim, after making 'an express determination that there is no just reason for delay.' (citations omitted). This power is largely discretionary ... to be exercised in light of 'judicial administrative interests as well as the equities involved' (citations omitted) and giving due weight to 'the historic federal policy against piecemeal appeals' (citations omitted). —— U.S. at ——, 113 S.Ct. at 1218, 122 L.Ed.2d at 615.

There are substantial reasons for immediately deciding the Trustee's claims. First and foremost is that it places the burden on the Trustee to prove his case. If he could not, that would end the case and there would be no need for the Defendant to incur the expense of filing and prosecuting its reparations complaint before the ICC. Similarly, the ICC would not have to expend its resources considering an unnecessary administrative complaint. On the other hand if, as here, the Court has determined that the Trustee should prevail on his claims, then the Defendant knows precisely how much it owes because this Court has determined the applicable filed rate. The only issue remaining is what, if any, reparations might be found to be owed to the Defendant.

### E. *SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE TRUSTEE*

■ Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hoyle v. Southern Bell Tel. & Tel. Co.*, 474 F.Supp. 1350 (W.D.N.C. 1979). Summary judgment is appropriate where the information supporting the movant's position, if presented at trial, would entitle the movant to a directed verdict. *Lundeen v. Cordner*, 354 F.2d 401, 407 (8th Cir.1966). As stated by the United States Court of Appeals for the Fourth Circuit in *Bland v. Norfolk & Southern Railway*, 406 F.2d 863 (4th Cir.1969):

[T]he function of a motion for summary judgment is to smoke out if there is any case, *i.e.*, any genuine dispute as to any material fact, and if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

406 F.2d at 866.

The party moving for summary judgment has the initial burden of showing that there is no genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). If the moving party makes a sufficient showing, the non-moving party must then present affirmative evidence demonstrating that there are genuine disputes of material fact that must be resolved before its claims can be decided. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the non-moving party fails to make such an affirmative showing, then, where there is thus no genuine issue as to any material fact, summary judgment is appropriate. *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

The only question presented here involves the application of the filed tariffs. The Court must determine whether the restriction to shipments "between the facilities of E.I. Du Pont de Nemours & Co. ..." dictates that the lower rate in Tariff 402 only applies to the Defendant's inter-facility shipments. Therefore, the question presented is whether the Trustee is entitled to summary judgment in its favor because the Defendant paid the lower inter-facility rate on shipments which were not "between" the Defendant's facilities.

■ As a result, the only question before this Court is a question of law. The mere dispute by the non-moving party as to the legal conclusions drawn from the facts presented does not operate as a bar to an award of summary judgment. *Sagers v. Yellow Freight System, Inc.*, 529 F.2d 721, 728–29 (5th Cir.1976). Summary judgment promotes judicial economy and avoids useless, expensive, and time-consuming trials where

there is no genuine, material factual issue to be tried. Thus, where, as here, the only questions to be decided are questions of law, summary judgment is appropriate.

█ It is well settled law that when the words of a tariff are used in their ordinary meaning with no particular connotation within the expertise of the ICC, then the interpretation of a tariff presents a question of law. *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 66, 77 S.Ct. 161, 166, 1 L.Ed.2d 126 (1956); *W.P. Brown & Sons Lumber Co. v. Louisville & N.R. Co.,* 299 U.S. 393, 397, 57 S.Ct. 265, 267, 81 L.Ed. 301 (1937); *Great N. Ry. Co. v. Merchants Elevator Co.,* 259 U.S. 285, 290, 42 S.Ct. 477, 478–79, 66 L.Ed. 943 (1922); *Union Pacific R. Co. v. Ore–Ida Potato Products, Inc.,* 252 F.2d 505, 507 n. 5 (9th Cir.1958).

█ A tariff is no different from any contract. *Great N. Ry Co., supra,* 259 U.S. at 291, 42 S.Ct. at 479. In interpreting a tariff, its terms must be taken in the sense in which they are generally used and accepted; and it must be construed in accordance with the meaning of the words used. *Chicago B. & Q.R. Co. v. United States,* 221 F.2d 811, 812 (7th Cir.1955); *United States v. Missouri–Kansas–Texas R. Co.,* 194 F.2d 777, 778–79 (5th Cir.1952).

█ A tariff is normally construed strictly against the carrier and any ambiguity or doubt is usually decided in favor of the shipper. *Coca–Cola Co. v. Atchison, T. & S.F. Ry. Co.,* 608 F.2d 213, 221 (5th Cir.1979); *TADMS Inc. v. Consolidated Freightways,* 619 F.Supp. 385, 392 (C.D.Cal.1985). However, the ambiguity or doubt must be a reasonable one and should not be the result of a strained interpretations of the language. There must be a substantial and not a mere arguable basis in order to justify resolving the doubt against the carrier. *Christensen v. Northern Pacific Ry. Co.,* 184 F.2d 534, 536 (8th Cir.1950); *Missouri–Kansas–Texas R. Co., supra,* 194 F.2d at 778–79. Thus, it is clearly within this Court's ability and jurisdiction to determine whether or not a rate is applicable without resort to the ICC.

█ The courts and the ICC have historically shared responsibility for the interpretation of tariff provisions. In *Western Pacific,* 352 U.S. at 68–69, 77 S.Ct. at 167–68, the Supreme Court held that phrasing an issue as a matter of tariff construction does *not* determine the issue of primary jurisdiction. "To hold otherwise," the Supreme Court noted, "would make the doctrine of primary jurisdiction an abstraction to be called into operation at the whim of the pleader." Thus:

... where the question is simply one of construction the courts may pass on it as an issue 'solely of law,' but where words in the tariff are used in a particular or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that 'the inquiry is essentially one of fact and of discretion in technical matters,' then the issue of tariff application must first go to the Commission.

*Id.* at 66, 77 S.Ct. at 166.

█ This proceeding concerns a very simple tariff interpretation question. That is, whether Tariff 402, because of the restrictive language contained in its title page, is limited in application to freight moving "between the facilities" of the Defendant.

█ Although the Defendant has submitted numerous affidavits, none of the affidavits contradicts the plain and objective reading of the "between the facilities" restriction, *i.e.,* that the rates applied *only* to the Defendant's inter-facility freight shipments. Also, there is no claim within any of the affidavits that the words, "between the facilities" are "technical" or "peculiar" transportation terms. Rather, the Defendant's affiants simply claim that to read the clear language of the restriction as limiting application to inter-facility moves would not conform to the parties' intent and conduct during the time period in which the freight was shipped. However, "intent" has nothing to do with the enforcement of the filed rate doctrine. As noted by the Supreme Court in *Maislin,* citing *Keogh v. Chicago & Northwestern R. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), "the rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." Moreover, as again stated by *Maislin:*

Deviation from it [the filed rate] is not permitted upon any pretext. Shippers and travellers are charged with notice of it, and they, as well as the carrier must abide by it ... Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the filed rate.

*Id.*, 497 U.S. at 127, 110 S.Ct. at 2766, citing *Louisville & Nashville R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915).

The intention of the parties in this case is as irrelevant as it was in *Maislin* when the Supreme Court declared as illegal the ICC's Negotiated Rates Policy Statements. Otherwise, as the Supreme Court noted in *Maislin:*

Past experience shows that billing clerks and other agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored shippers, while other shippers, less fortunate in their relations with carriers and whose traffic is less important, would be compelled to pay the higher published rates.

*Id.* at 128, 110 S.Ct. at 2766.

*See also, Magnolia Provision Co. v. S.L. & W. Ry. Co.*, 20 F.2d 384 (S.D.Tex.1927), *aff'd* 26 F.2d 72 (5th Cir.1928). There the district court was presented with a question of whether an erroneously published rate was an effective rate. The court specifically noted that in such a situation, the intent of the drafter is irrelevant to the determination of the applicable rate.

I agree with the carriers that the evidence in the case, both oral testimony and the structure of the tariff itself, shows plainly that the 23–cent rate was not originally drafted for the bracket 3405; but I agree with the plaintiffs that *the question of what the carriers intended abstractly is wholly immaterial, and that none of this evidence is relevant to the issue here joined,* because in law it is an irrebuttable presumption that a rate filed with the Commission and published is the lawful rate, and the

carrier cannot be heard to dispute the rate by such claim.

20 F.2d at 385 (emphasis added).

 The Defendant's reliance on old tariffs which do not contain restrictive language cannot change the simple fact that whether it be by mistake, ignorance or intention, Bulldog published lower rates, beginning in 1982, which applied *only* between the facilities of the Defendant. The fact that numerous shipments of freight moved by Bulldog utilizing these lower rates *from* and *to* the Defendant's facilities does not change the definition of the word "between." In light of *Maislin* and the line of cases that predate *Maislin,* the constant repetition of a misbilling cannot change the operation of the filed rate doctrine.

 The word "between" is defined in *Webster's New Twentieth Century Dictionary,* Unabridged, Second Edition (Simon & Schuster, 1983) as meaning:

1. In or through the space that separates (two things).... 8. To the exclusion of all, but both of; as, they divided between them. 9. One or the other of; as choose between love and duty.

As noted from the above, the word "between" necessarily implicates *only* two discrete points. Those two discrete points are further modified by the word "facilities." Using the plain English language definitions of these two words, the *only* rational interpretation of the restriction can be that for the Defendant to enjoy the lower tariff provisions, it must tender freight moving between two points which are the Defendant's facilities, and no other points. This is the only view consistent with the common and commercial usages of the word "between." It is well established that such common meanings govern in the absence of specific definitions contained within a tariff to the contrary. *See W.J. Foye v. A.T. & S.F. Ry. Co.*, 251 I.C.C. 108, 109 (1942).

In addition, the ICC has long ago interpreted the word "between" to mean the rate that applies specifically between two points in both directions. In *Wyeth Company v. Great Northern Railway Co., et al.*, 299 I.C.C. 636, 639 (1957), the ICC stated, "It has

long been understood in tariff parlance that where a tariff provides for the application of a particular rate 'between' two points, that rate applies between those points in both directions." *See also, Advanced Thresher Company v. Orange Northwestern Railroad Company,* 15 I.C.C. 599, 600 (1909).

■ The Defendant places great emphasis in its cross-motion on *National Van Lines, Inc. v. United States,* 355 F.2d 326, 333 (7th Cir.1966). In that case, the court established certain guidelines for interpreting ambiguous tariffs. Since, *National Van Lines* involved an ambiguous tariff—a tariff susceptible to two reasonable interpretations—it was very different from the case at hand. Tariff 402 is plain on its face—the tariff states in clear and plain language that its application is limited to shipments between the facilities of the Defendant. Thus, there is no ambiguity and therefore no basis for applying the tariff interpretation guidelines of *National Van Lines.*

■ The most crucial aspect of the Defendant's Cross–Motion is that there be some ambiguity in the tariff. The Defendant devotes the vast majority of its argument and supporting affidavits to presenting evidence of the intention of the parties, the past practices of the parties, and Bulldog's certificates of convenience on file with the Commission. However, without an ambiguous tariff, there is no basis for reference to this extrinsic evidence. When a tariff is plain on its face, courts need not and *cannot* look beyond the four corners of the tariff to determine its meaning. *National Van Lines,* 355 F.2d at 352. "When words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law. But words are used sometimes in a peculiar meaning. Then extrinsic evidence may be necessary to determine the meaning of words appearing in a document." *Great No. Ry. Co. v. Merchants Elevator Co.,* 259 U.S. 285, 291–92, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922).

■ The Defendant claims that "the Trustee's proposed interpretation of Tariff 402 is simply a *post hoc* reading that has absolutely no support if the intent of the parties, including the tariff's drafter, is to be given any effect." However, this argument misses the point entirely. The intent of the parties comes into play *only after* the court has determined that the tariff is ambiguous. When a tariff is ambiguous, the court will then look to the intent of the parties and other extrinsic evidence to determine the meaning of the tariff. But, the intent of the parties cannot be used to create an ambiguity. *National Van Lines,* 355 F.2d at 332.

■ The Court agrees with the Trustee that the Defendant's expansive reading of the term "between" effectively renders the restriction meaningless. As noted by the Defendant in its Cross–Motion, the tariff must be construed so as to give effect to all of its terms. *Great N. Ry.,* 259 U.S. at 291, 42 S.Ct. at 479. Thus, the only interpretation which gives full effect of the tariff is the interpretation which enforces the restriction to inter-facility shipments.

■ The Defendant argues that one must look beyond the four corners of the tariff to ascertain its meaning. However, this is plainly wrong. The purpose of the tariff system is to create a vehicle for public dissemination of carrier's rates. If one shipper knows what other shippers are paying for similar transportation services, it will be difficult for the carrier to discriminate against that shipper. *See* 49 U.S.C. Section 10761, *New Haven R.R. v. Interstate Comm. Comm'n,* 200 U.S. 361, 391, 26 S.Ct. 272, 276–77, 50 L.Ed. 515 (1906). Thus, the Interstate Commerce Act requires the publication of tariffs, making information on rates and services readily available to the shipping public.

.However, the effectiveness of the publication system breaks down when a shipper must look beyond the tariff to understand its application. For example, the Defendant argues that in order to interpret Tariff 402 properly one must look at the history of the tariff, the intent of the parties, Bulldog's certificate of public convenience, and the subsequent dealings of the parties. But none of this information is contained in the tariff itself. The Court must interpret the tariff as would any other neutral observer who exam-

ines the tariff on file with the ICC. The Court must look only to the words and information contained in the four corners of the tariff itself. Any other interpretation circumvents the tariff publication requirements of 49 U.S.C. Section 10761.[21]

Finally, the Court finds unpersuasive the Defendant's arguments concerning the reference Bulldog's Sub 11 authority on the title page of Tariff 402. The parties agree that the phrase "MC–118420 Sub 11" refers to Bulldog's operating authority which allowed it to transport all of the Defendant's commodities without regard to whether or not they moved between facilities. The Court finds that providing this information on the title page of the tariff, does not, in any way, create an ambiguity. Rather, the use of this information, without regard to the intent of the parties, merely informs the tariff reader that Bulldog had sufficient operating authority to provide services which were covered by the rates contained in Tariff 402. The Court simply cannot agree with the proposition that by placing the reference to the Sub 11 authority within the tariff, the tariff thereby incorporates the full scope of the Sub 11 authority to the tariff.

The Court, thus concludes that the Trustee's interpretation of Bulldog's tariffs is correct and he should be awarded the appropriate amount of undercharges. The parties have agreed that as of June 3, 1992 the principal amount of interstate freight undercharges sought by the Trustee, plus accrued interest to that date, is $1,339,853.30, with per diem interest thereafter in the amount of $227.22. This reflects a reduction in the original amount sought by the Trustee of $203,702.94 of interstate moves between the Defendant's facilities. It also reflects a reduction of $86,030.89 of possible intrastate moves, a claim which this Court will bifurcate and will schedule for trial.

Finally, the Court finds that the Trustee is entitled to pre-judgment interest based on the interest rate for three-month Treasury Bills calculated from the date of the issuance of the freight bill for each shipment in question. *See Fawley Motor Lines v. Cavalier Poultry Corp.,* 235 F.2d 416 (4th Cir.1956); *Coliseum Cartage Co. v. Rubbermaid Statesville, Inc.,* 975 F.2d 1022 (4th Cir.1992); *Cooper, Trustee for Bulldog Trucking, Inc. v. Bowater, Inc.,* Adv. No. 91–3583 (Bankr.W.D.N.C.1993).

## F. *RULE 54(b) CERTIFICATION IS NOW PROPER*

Rule 54(b) of the Federal Rules of Civil Procedure provides as follows:

*Judgment Upon Multiple Claims or Involving Multiple Parties.* When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Before entry of final judgment under Rule 54(b), the Court must determine that the action involves multiple claims and that the judgment is a decision upon a cognizable claim for relief and that it is "final" in that it is "an ultimate disposition of an individual claim entered in the course of a multiple claims action." *Curtiss–Wright Corporation v. General Electric Company,* 446 U.S. 1, 7, 100 S.Ct. 1460, 1464, 64 L.Ed.2d 1 (1980) *("Curtiss–Wright")* (quoting *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 436, 76 S.Ct.

21. As noted by Plaintiff's auditor, Rodney A. Johnson, in his Affidavit submitted with Plaintiff's Motion, "Tariffs are to be on file at the ICC for public scrutiny. The purpose is to fully disclose to the public what the legally binding filed rate is. For this reason it is unthinkable that John Q. Public must do research outside of the tariff in order to interpret its applicability."

895, 900, 100 L.Ed. 1297 [1956] ). If the Court determines that the judgment in the multiple claims action is indeed final it must next expressly determine whether there is any just reason for delay in the entry of final judgment. *Curtiss–Wright*, 446 U.S. at 8, 100 S.Ct. at 1464–65. "It is left to the sound judicial discretion of the district court to determine the 'appropriate time' when each final decision in a multiple claims action is ready for appeal." *Id.* (quoting *Sears, Roebuck & Co.*, 351 U.S. at 435, 76 S.Ct. at 899–900). The Court, in the exercise of its discretion, must consider the interest of sound judicial administration along with the equities of the case. *Id.*, 446 U.S. at 8, 100 S.Ct. at 1464–65. Finally, the Court must expressly direct entry of the final judgment. This express determination and direction are what is known as the Rule 54 certification.

■■■■ The mere existence of pending nonfrivolous counterclaims, permissive or compulsory, does not prevent certification of a final judgment under Rule 54(b). *Id.* The issue for the Court is whether the interests of sound judicial administration and the equities of the case weigh in favor of certification and entry of final judgment. *Id.* *See Reiter*, 507 U.S. at ——, 113 S.Ct. at 1218, 122 L.Ed.2d at 615 (1993). There is no precise test applicable to every case to determine whether there is no just reason to delay entry of judgment and the Court should consider any factor relevant to a particular case consistent with the policies the rule seeks to promote. *Bank of Lincolnwood v. Federal Leasing, Inc.*, 622 F.2d 944, 948 (7th Cir. 1980) ("*Bank of Lincolnwood*"). Once the trial court has exercised its discretion and certified a final judgment pursuant to Rule 54(b) the appellate courts will not reweigh the equities or reassess the facts, but will simply "make sure that the conclusions derived from those weighings and assessments are juridically sound and supported by the record." *Bank of Lincolnwood*, 622 F.2d at 948 (relying on *Curtiss–Wright*, 446 U.S. 1, 100 S.Ct. 1460).

■■■ Immediate appealability is the obvious consequence of a final judgment but is not the sole reason for entry of final judgment pursuant to Rule 54(b). *Id.* at 949.

"In determining whether there is no just reason for delay, the district court may properly consider all of the consequences of a final judgment or the lack thereof and balance the competing interests of the parties in the context of the particular case." *Id.*

· There is now no just reason to delay entry of the final judgment in favor of the Trustee. By its own terms no provision of the NRA can apply to the Trustee to divest him of property of the estate (*e.g.*, by terminating or modifying the value thereof based on the debtor's financial condition) or to intrude on this Court's jurisdiction by requiring referral of any issue. Nevertheless, the ICC *sua sponte* is moving rapidly to implement the provisions of the NRA against the Trustee which will destroy valuable property of the estate. Even if the ICC reaches the issues of rate reasonableness in the Defendant's reparations action, it is now clear that the ICC will not provide this Court with the information it requires regarding reparations. Just cause now exists to support the exercise of the Court's discretion to make a Rule 54 certification and direct entry of final judgment in favor of the Trustee. This Court's purpose in "referring" the issue of rate reasonableness to the ICC is now wholly frustrated.

The Supreme Court, in reviewing the propriety of a Rule 54(b) certification has pointed out that a trial court's primary duty in applying the Rule is to promote the sound administration of justice. *Curtiss–Wright*, 446 U.S. at 8, 100 S.Ct. at 1464–65. In the case at bar, immediate entry of final judgment is necessary to enforce the jurisdiction of this Court, to preserve assets of the Bulldog bankruptcy estate and to promote the efficient administration of the bankruptcy estate. The ICC's attempts to enforce the provisions of the NRA in the reparations action of the Defendant threaten to destroy assets of the estate, in addition to further delaying the administration of the Bulldog bankruptcy estate. This will harm not only the bankruptcy estate but will also burden the Court.

In *Reiter* the Supreme Court noted that the insolvency of the party seeking separate judgment is a factor weighing against sepa-

rate judgment, but is not an absolute bar. Other equities in the case may favor separate judgment even when the party seeking judgment is insolvent. *Id.* The equities in this case now favor entry of final judgment. Defendant has no defense to the freight undercharge of claims of the Trustee, and this has been made abundantly clear by the Supreme Court in both *Maislin* and *Reiter.*

The NRA makes no change in this law. Nevertheless, in deference to the Defendant's rights to have its reparations claim on rate reasonableness heard, this Court will not rescind its previous modification of the Section 362 stay which permitted the Defendant to seek a determination of what, if any, reparations the Defendant is entitled to receive.

■■■ The tariff rates of Bulldog, like those of Carolina Motor Express in *Reiter,* "are legal rates, binding on both the shipper and the carrier." *Reiter,* 507 U.S. at ——, 113 S.Ct. at 1221, 111 L.Ed.2d at 619. In such a case, but for the insolvency of Bulldog, the equities would clearly favor entry of separate judgment on the freight undercharge claims. See *Id.* The equities of this case balance in favor of immediate entry of a separate judgment with appropriate protection for the Defendant's potential recovery under its reparations counterclaim. Entry of final judgment on the Trustee's claim with a stay of enforcement pursuant to Rule 62(h) until the expiration of the original twelve month period this Court established for ICC consideration of rate reasonableness will satisfy the goals of Rule 54(b).

■■■ If the ICC does not by April 13, 1994 (which is the expiration of the original twelve month period established by this Court) provide the Court with a meaningful decision in the Defendant's reparations action, the Court will at the request of the Trustee and after a notice and a hearing decide whether to rescind the stay of execution. This will protect the bankruptcy estate by ensuring against the potential future insolvency of Defendant and the typical collection problems with any judgment, it will protect Defendant's reparations counterclaim, and it will promote the sound administration of justice by moving this case off dead cen-

ter. This is a reasonable exercise of the Court's discretion as case law demonstrates. *See Norris Manufacturing Company v. R.E. Darling Co., Inc.,* 315 F.2d 633 (4th Cir. 1963), where the court held there was no abuse of discretion in entering final judgment on the plaintiff's claims as there was extraordinary delay on the trial of the defendant's counterclaims.

In the case at bar, provided the ICC timely and properly acts on Defendant's reparations action, there is no possibility that Defendant will have a reimbursement claim greater than the sum of the Trustee's judgment and therefore no possibility that Defendant will fail to recover sums due to it as was the case in *Norris Manufacturing.* As in *Norris Manufacturing,* there is no defense to the claim of the Trustee and no reason to delay entry of final judgment.

In *Crancer v. Lowden,* 315 U.S. 631, 62 S.Ct. 763, 86 L.Ed. 1077 (1942) the Supreme Court considered a case analogous to the case at bar. In *Crancer,* the shippers sought to stay the district court collection action of the carrier until the ICC could decide a pending rate reasonableness reparations action. The Supreme Court held "there was no abuse of discretion by the trial judge" in not staying the district court action since the equities weighed in favor of the carrier. Indeed, the *Reiter* Court cited *Crancer* for this proposition.

The case at bar is like *Crancer* in its essential features and the result in *Crancer* should obtain here with the exception that execution on the judgment be temporarily stayed. As in *Crancer,* the tariff rate to be applied in the case at bar is clear and has been determined by this Court. It remains only for this Court to see that the tariff rate is collected. The Defendant will suffer no harm and the administration of the bankruptcy estate and the Court's docket will be advanced by determining with finality the amounts due the Trustee on his freight undercharge claim.

■■■ The Court is aware of the possibility of multiple appeals in this case. However, that does not alter the balance of the equities or the administrative benefits to be obtained by a final determination of Defendant's liabil-

549

ity to the Trustee on the freight undercharge claims.

■ In any event, the possibility of multiple appeals is no bar to entry of final judgment in this case. The Court may in the exercise of sound discretion certify a final judgment for appeal even if another claim which arises out of the same transaction or occurrence is still pending. *Cold Metal Process Company v. United Engineering & Foundry Company,* 351 U.S. 445, 452, 76 S.Ct. 904, 908–09, 100 L.Ed. 1311 (1956). "If the claims are legally distinct and involve at least some separate facts, the district court has the power to enter a Rule 54(b) judgment ..." in the exercise of its sound discretion. *Olympia Hotels Corporation v. Johnson Wax Development Corporation,* 908 F.2d 1363, 1368 (7th Cir.1990). In exercising its discretion, the Court may take into account whether the same issues will have to be decided more than once if there are multiple appeals. *Curtiss–Wright,* 446 U.S. at 8, 100 S.Ct. at 1464–65. In the case at bar, the claims are legally distinct, involve separate facts and will not cause the appellate courts to decide the same issues more than once.

A separate appropriate order and judgment shall be entered granting relief in accordance with the findings and conclusions herein. It is hereby recommended that the United States District Court for the Western District of North Carolina adopt the foregoing Order and Memorandum Decision.

Dated this the 17th day of February, 1994.

### RECOMMENDED ORDER AND JUDGMENT

**DETERMINING THE INAPPLICABILITY OF THE NEGOTIATED RATES ACT 1993, GRANTING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF ON HIS CLAIMS, DENYING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT, MAKING RULE 54 CERTIFICATION, and STAYING ENFORCEMENT OF JUDGMENT UNDER RULE 62(h)**

[February 17, 1994]

This matter came on to be heard and was heard on February 1, 1994 at a consolidated hearing in this and numerous other similar pending adversary proceedings on Motion of the Plaintiff, Langdon M. Cooper, Trustee (the "Trustee") for Reconsideration of this Court's prior order denying a certification under Fed.R.Civ.P. 54(b) and immediate entry of summary judgment; and after consideration of the record and the arguments of counsel for the Interstate Commerce Commission (the "ICC"), the Trustee, numerous defendants in the other similar adversary proceedings and E.I. du Pont de Nemours & Co. (the "Defendant"), the Court enters the following Order and Judgment under Fed. R.Civ.P. 58. A separate Order and Memorandum Decision has been entered and it specifies the basis for the entry of this Order and Judgment.

*The following Order and Judgment determining the inapplicability to the Trustee of the Negotiated Rates Act of 1993, granting and entering final summary judgment for the Trustee on his claims, denying the Defendant's cross motion for summary judgment, making a certification under Fed. R.Civ.P. 54(b) and staying enforcement of the judgment under Fed.R.Civ.P. 62(h) is* **HEREBY RECOMMENDED** to the United States District Court for adoption and entry herein after "notice and a hearing", for the reason that this matter has been determined by the undersigned to be a matter related to a case under Title 11, all in accordance with the provisions of 28 U.S.C. § 157(c)(1).

**IT IS HEREBY ORDERED AND ADJUDGED:**

1. Section 2 of the Negotiated Rates Act of 1993, signed by the President on December 3, 1993 as Pub.L. No. 103–180 (s. 412), is inapplicable to the Trustee and the bankruptcy estate of Bulldog Trucking, Inc.

2. There is no just cause for delay of the grant and entry of judgment in favor of the Trustee on his interstate freight undercharge claims.[1] Therefore, the Trustee's Motion for Summary Judgment on his claims based on interstate movement is hereby **GRANTED**

---

1. The Court has in a separate order bifurcated the Trustee's claims for alleged intrastate freight movement in the amount of $86,030.89 and will schedule those claims for trial.